**UNITED STATES**

v.

**ARKANSAS POWER & LIGHT CO.**

No. 14660.

United States Court of Appeals
Eighth Circuit.

Nov. 17, 1953.

Rehearing Denied Dec. 24, 1953.

Morton Hollander, Attorney, Dept. of Justice, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., James T. Gooch, U. S. Atty., W. H. Gregory, Asst. U. S. Atty., Little Rock, Ark., Melvin Richter, Paul A. Sweeney and George F. Foley, Attorneys, Department of Justice, Washington, D. C., and R. L. Davidson, Chief Counsel, Southwestern Power Administration, Department of the Interior, Tulsa, Okl., on the brief), for appellant.

W. H. Holmes (House, Moses & Holmes and E. B. Dillon, Jr., Little Rock, Ark., on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment of dismissal, upon the merits, of the Government's complaint in an action to recover damages from the defendant (appellee) for breach of contract.

The case was here before. 165 F.2d 354. The first appeal was taken by the Government from an order dismissing its complaint upon the ground that the action had been prematurely brought, since the Arkansas Public Service Commission had not approved the contract in suit. We reversed and remanded the case for further proceedings.

The original complaint, filed April 4, 1946, alleged the nonperformance by the defendant of the provisions of paragraph numbered 28 of a written contract between the parties, dated February 20, 1945, which contract provided for the sale and delivery to the defendant of electrical energy generated by the Government's Norfork Dam Project in Arkansas. Paragraph 28 reads as follows:

"28. In recognition of the established policy of the Government and in order to

effectuate the terms of Executive Orders No. 9366 and 9373 [U.S.Code Cong.Service 1943, pp. 5.66, 5.72], and make available, immediately, to war plants and establishments, public bodies and co-operatives, and other persons, in that order of preference so far as practicable, the benefits resulting from the construction and operation of the Norfork Dam Project, and in consideration of the Government making available to the Company [defendant] a substantial part of the power and energy generated at the Norfork Dam Project, the Company agrees:

"(a) That it will reduce, effective sixty (60) days after the execution of this agreement (and will continue the reduction thereafter for the duration of this agreement) its present rate of charges for electric service to the United States, its agencies, and industries or activities financed in whole or in part by the United States (excepting REA Co-operatives) so as to effectuate a total reduction to such customers of at least $150,000 annually.

"(b) That it will, within sixty (60) days after the execution of this agreement, put into effect and maintain during the term of this agreement a revised rate schedule applicable to all rural electric cooperatives served by the Company which will result in a net average rate for each month to each Rural Electric Cooperative taking service under such schedule and having a monthly load factor of 35% or larger of six (6) mills or less per kilowatt-hour."

The complaint further alleged that "the defendant wholly failed to complete performance of the said contract in accordance with Article [paragraph] 28 (a) and (b) by filing rate schedules with the Public Service Commission of the State of Arkansas, and securing its approval thereof, reflecting the annual savings of $150,000 per year on government loads and rate schedules applicable to all Rural Electric Cooperatives served by the defendant which would result in a net average rate for each month to each Rural Electric Cooperative taking service under such schedule and having a monthly load factor of thirty-five per cent or larger of six (6) mills or less per kilowatt-hour, and still refuses to complete performance of said contract in such respects, * * *."

The original complaint asserted that, by reason of the nonperformance of the defendant's obligations to file and secure the approval of reduced rate schedules under paragraph 28(a) and (b), the defendant for the year beginning April 21, 1945, became liable to the Government for damages in the sum of $155,-000. The Government in the original complaint and first amended complaint asked for specific performance and damages.

The position of the defendant, as reflected by its answer and cross-complaint, was, in effect that it had in the fall of 1944 effected the rate reductions called for by paragraph 28 of the contract, by filing schedules of revised rates with the Arkansas Department of Public Utilities [succeeded by the Arkansas Public Service Commission on February 12, 1945], which schedules were approved by the Department of Public Utilities on October 31, 1944, to become effective November 27, 1944; that the written contract signed on or about February 20, 1945, and dated that day, was to evidence an agreement reached by the parties in the summer of 1944; that the parties had intended to date the written contract prior to the general rate reductions approved by the Arkansas Department of Public Utilities on October 31, 1944, and that the dating of the written contract February 20, 1945, was the result of a mutual mistake of the parties, and that the defendant was entitled to have the contract reformed in that regard.

The order of dismissal from which the first appeal was taken by the Government was entered December 12, 1946. Our opinion reversing the order and remanding the case was filed January 7, 1948. 165 F.2d 354.

After the remand of the case to the District Court for further proceedings and on April 2, 1948, the Government filed a second amended complaint in which it asserted that the contract in suit had terminated on June 30, 1947. In that complaint the prayer for specific performance was dropped, but damages for nonperformance were sought in the sum of $340,155.55, that being the amount by which the Government contends the defendant, in conformity with paragraph 28(a) and (b) of the contract, should have secured a reduction in its rates to governmental customers during the period April 21, 1945, to June 30, 1947.

The evidence of the Government was to the general effect that the rate reduction made in the fall of 1944 did not include the rate reductions to governmental customers and rural electric co-operatives called for by the contract, and that there was no agreement or understanding on the part of the Government that the rate reductions contemplated by paragraph 28(a) and (b) would be, or were, made prior to the execution of the written contract which required the approval of the Secretary of the Interior, who had not formally approved or authorized its execution until February 2, 1945.

The evidence of the defendant tended to show that an understanding had been reached by the parties in the summer of 1944, which was reduced to writing and became the contract in suit; that it was understood that a general rate reduction being contemplated by the Arkansas Department of Public Utilities and the defendant, to become effective in the fall of 1944, should reflect the rate reductions to governmental customers and rural electric cooperatives provided for in the understanding reached with the representative of the Government; that the schedules which brought about the general rate reductions ordered and later approved by the Arkansas Department of Public Utilities in the fall of 1944 included the reductions in rates agreed upon; that no further rate reductions were contemplated; and that, when the written contract was signed in February 1945, the President of the defendant, who executed the contract on its behalf, thought he was "signing something that had already been performed."

The District Court determined that the defendant had complied with the contract in all respects; that it was dated February 20, 1945, because of a mutual mistake of the parties, and that it should be reformed by substituting "October 31, 1944," the date the general reductions in rates under revised schedules were approved by the Arkansas Department of Public Utilities; and that the defendant was entitled to a dismissal of the Government's complaint.

The Government asserts that there was an inadequate evidentiary basis for the District Court's determination that the contract was dated February 20, 1945, through a mutual mistake of the parties and that the general rate reductions approved by the Arkansas Department of Public Utilities on October 31, 1944, included the reductions provided for in paragraph 28(a) and (b) of the contract; and asserts that, under the evidence and the applicable law, the Government was entitled to a judgment against the defendant for $331,629.63. We are asked to direct the District Court to enter judgment against the defendant in that amount.

On review, the defendant, as the prevailing party, is entitled to the benefit of all inferences which reasonably can be drawn from the evidence viewed in the light most favorable to the defendant. Cleo Syrup Corp. v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 150 A.L.R. 1056; Holt v. Werbe, 8 Cir., 198 F.2d 910, 917. Keeping that in mind, the factual situation which gave rise to this controversy may be briefly and generally stated as follows:

The Norfork Dam on the North Fork of the White River in Arkansas, a Government project, was nearing completion in the fall of 1943. The United States was at war. It was seeking,

through the Southwestern Power Administration, an agency of the United States Department of the Interior, to find a purchaser for the electric energy to be produced by the Dam when completed and when in commercial operation, which it was thought might be shortly after the fall rains in 1944.

The Government had no transmission lines in the vicinity of the Dam and was in no position to construct such lines or to distribute electric energy to consumers in the area to be served by the Dam. The defendant was engaged in generating, transmitting and selling electric energy in that area, had transmission lines, and was in a position to take and distribute the electric energy produced by the Dam.

Douglas G. Wright, the Administrator of the Southwestern Power Administration, undertook to make a satisfactory arrangement with the defendant for the sale to it of the electric power to be generated by the Dam. The first draft of a proposed agreement was prepared and submitted by him to the defendant in the fall of 1943. This resulted in a counter offer by the defendant in January, 1944, which was rejected. Negotiations followed, in which the Government was the "aggressor". Wright pushed the negotiations and prepared and submitted a number of drafts of proposed contracts to the defendant.

At a conference between Wright and the defendant's President, C. H. Moses, on June 8, 1944, there was a discussion of ways and means by which the benefits which would accrue to the defendant from the purchase of electric power from the Government could be passed on to those customers of the defendant to whom the Government was required to give preference. Originally the Government had intended to serve governmental customers directly, but the defendant would not enter into any contract on that basis. The defendant had suggested that the benefits to such customers might be passed on by way of a reduction of the defendant's rates to them. The parties were aware that any rates the defendant might put into effect would have to be approved by the Department of Public Utilities of the State of Arkansas.[1] Wright and Moses therefore decided, after their conference on June 8, 1944, to confer informally on the same day with the Commissioners of the Department of Public Utilities relative to the proposed rate reduction for governmental customers.

The Department of Public Utilities had, since sometime in 1943, been conducting an investigation of the electric rates of the defendant, looking toward the reduction of such rates. There had been a long and involved hearing before the Department with respect to this investigation. The hearing had ended about the latter part of May, 1944. The Department on June 8, 1944, had not as yet issued an order, but shortly thereafter and about July 15, 1944, its order dated June 24, 1944, was issued. This order fixed the defendant's rate base and rate of return, and required the defendant to file rate schedules which would effect a reduction of its revenue in the amount of $975,000 annually.

With respect to the informal conference held on June 8, 1944, by Wright and Moses with the three Commissioners of the Department of Public Utilities (which is also referred to in the record as the Public Service Commission), Moses testified as follows:

"* * * It was at this June 8 conference [between Wright and Moses] that the $150,000 rate reduction to Government customers came in, and since the Department of Public Utilities would have to pass on all rate matters, it was

---

1. The contract in suit contains the following provisions:

"37. This agreement, and all rights and obligations of both of the parties hereto, are expressly conditioned upon the granting of any and all necessary approvals, authorizations or consents of any commission or commissions, or other regulatory body or bodies, having jurisdiction in the premises."

decided that an informal conference should be held with the Public Service Commission of Arkansas to ascertain whether the Commission would go along with the rate reduction proposed. Especially was this desirable in view of the fact that the Commission was just finishing up a proceeding involving the entire financial and rate structure of the Company, and it was presumed and understood at that time that we would have what we thought a very substantial rate reduction and that if we were going to get this done by putting in this reduction of rates that we had agreed upon ourselves we had better go out and have it agreed upon with the Public Service Commission because without their agreement it couldn't be put into effect. We got in touch with the Commission and had a conference with the Commission and staff on the subject of this contract. The Commissioners at that time consisted of Mr. Marvin Hathcoat, Harrison, Arkansas; Mr. Joe Morrison, Stuttgart, Arkansas, and Mr. Arthur B. Hill, of Little Rock, Arkansas. I think most of the staff of the Commission were present. I think the meeting was in the morning in the Public Service Commission hearing room in the State house.

"I explained to the Commission that we had agreed upon the contract to purchase from Southwestern Power Administration the Norfork Dam power, telling them the substance of the contract, what we were to pay for the power and how it was going to be handled, the terms of the contract generally, and that in that connection it was to be provided that there was to be a $150,000 rate reduction; that the rate reduction was primarily for Government customers, financed by the Federal Government, and it was satisfactory to us, and we thought it was a good contract and we were ready to negotiate it and that as soon as it could be reduced to writing, why, we were going to execute the contract and bring it out to them so that it could be in that proceeding. We wanted them to understand what was being done and we wanted to know if we could go ahead

with their approval; that it was an important contract and an important step for our Company and might determine a policy for the Public Service Commission.

"Mr. Wright made in substance the same statement. I can't detail what he said as much as I did mine although he said that such a contract had been agreed upon and it was in process and would shortly be concluded. Mr. Wright said something during the proceeding that caused Mr. Arthur Hill [one of the Commissioners] to speak up and say in effect, 'Now, I want—I want to make this statement here now. You, Mr. Moses, and you, Mr. Wright, haven't got any right sitting down among yourselves and agreeing that you are going to put in a rate reduction to the customers in the State of Arkansas. That is the jurisdiction of this Public Service Commission, and we have been working mighty hard out here for months now reclassifying these accounts, determining a rate case, finding a rate of return and determining the reduction that should be given. Now, whatever is going to be done, we are going to do it and, Mr. Wright, you and Mr. Moses are not going to do it, and we want that understood now.' Then he said that, 'But I have got no objection to your going ahead and working out a contract. I hope you can, and if you work out a contract and you get it out here in this proceeding, we will go along with you on it including the reduction you want to work out if there is nothing wrong about it.' But he said, 'I want it distinctly understood now by both of you that whatever rate reduction is going to come out of this contract and out of this proceeding, that you all are having these conferences you are having, is going to come in this proceeding and if you are going to get a rate reduction from this Commission, you had better get it up and bring it out here so that it can be reflected in the schedules that you are going to file in accordance with any order that we make, because after this until things look more settled than they

are now, there are not going to be any more rate reductions, and I want you to thoroughly understand that, but I do want to tell you that I like to work along with you, and you can go ahead and bring it on in.' Sometime along there, Mr. Joe Morrison [also a Commissioner] spoke up and said he wanted to substantiate what Mr. Hill said, and he spoke about bringing it out there and getting it in that proceeding which would be lasting for some weeks yet, and while they were finishing the hearings they didn't have the order prepared and it would be some time before rate schedules would be filed, and there ought to be plenty of time to get that done. He said that there would not be any more rate reductions because they had, in their order, provided what they called an excess revenue fund; that all excesses would go into that fund; that after that the only way anybody could get any money out of that fund is when the Commission felt it should be distributed back to the customers, and for the purpose of carrying that out, that the Commission was retaining jurisdiction of that proceeding there at the time, and that was understood, and that is in substance what happened out there that day, and we left there, all of us, knowing that. Mr. Wright went back to prepare the final draft of the contract to send back over to us for approval, so that it could be immediately executed and so that we could go ahead and perform out there.

\*  \*  \*  \*  \*  \*

"\*  \*  \* At this conference before the Public Service Commission, the Commission told us in effect to stay with the essentials of the contract and bring it out there and they would give it the consideration that they thought it should have and they saw no reason why they shouldn't go along with us and it would be incorporated in that proceeding."

The third draft of the proposed contract between the parties was thereafter prepared by Wright and was agreed to, subject to a few verbal changes, in Dallas, Texas, on August 23, 1944, at a meeting attended by Moses and Wright,

and there was at that meeting a "complete meeting of the minds," and no substantial changes were made in the form of the contract thereafter.

Moses testified that he understood from the meeting in Dallas that Wright would proceed promptly to get the contract approved and its execution authorized by the Secretary of the Interior, that it would be executed soon after the meeting, and that both parties would perform under it as it was drafted.

Wright testified that the final or fourth draft of the proposed contract was prepared by him, just after the Dallas meeting, to include changes suggested at that meeting, and that it "certainly reflected the meeting of the minds, the tentative agreement arrived at in the Dallas meeting, and represented a draft of the contract which the Company would sign and which I felt I could recommend to the Secretary of the Interior for his approval."

After the Dallas meeting and the preparation of the final draft of the proposed contract embodying what Wright and Moses had agreed to on August 23, 1944, Wright on August 25, 1944, sent a communication to the Director of the Power Division of the Department of the Interior, enclosing the proposed contract, stating that in his opinion it represented "the best arrangements that could be made with the Company for the disposition of the electric energy from the Norfork Dam," and recommending that he be authorized to execute it. Wright enclosed with this communication a "Memorandum for the Secretary," dated the same day, describing and explaining the proposed contract. This Memorandum contained, among others, the following statements:

"The Company agrees under the contract to reduce its electric rates for the service to the United States, its agencies and industries or activities financed in whole or in part by the United States (excepting REA Cooperatives) so as to effectuate a saving to such consumers of at least $150,000.00 per year. The

Company also agrees under the contract to place in effect a revised rate schedule for service to all of its REA consumers having a monthly load factor of 35% or greater so that the effective rate to such consumers will be 6 mills or less per kilowatt hour. The *present* average rate to REA consumers is approximately 8.4 mills per kilowatt hour so that the revised rate schedule will result in a direct saving to REA consumers of not less than $25,000.00 per year. * * *

* * * * * *

"The proposed contract is satisfactory to the Company and to this Administration. It is recommended that it be approved as to form and that I be authorized to execute the contract for the United States as of September 15, 1944."

Wright hoped to get the contract into effect by September 15, 1944, before the Dam went into commercial production of electric energy.

The Director of the Division of Power submitted the final draft of the contract to the Secretary of the Interior with a memorandum which the Director prepared, dated February 1, 1945. This reads as follows:

"Feb. 1, 1945.

"Memorandum for the Secretary.

"Your approval is requested for the execution of the enclosed contract under which the Southwestern Power Administration proposes to render electric service to the Arkansas Power & Light Company during the war from the Norfork Dam project. A summary of the contract is set out in the memorandum from the Administrator to you dated August 25, 1944, which is also enclosed.

"The submission to you of the memorandum and contract has been delayed at the request of the Administrator pending completion of negotiations with Defense Plant Corporation for the rental of one of the Defense Plant Corporations' floating power plants of 30,000 kilowatts capacity which was to supplement the Norfork hydroelectric plant. Our first negotiations were for one of the barges which was later appropriated by the Army. We then started negotiations for the barge located at Pensacola, Florida, which, last week, was assigned to Jacksonville, Florida, by the Chairman of the War Production Board where the power shortage was recently found to be more acute than in Arkansas.

"It is recommended that the proposed contract be approved as to form and that the Administrator be authorized to execute it for the United States.

"Arthur Goldschmidt,
Director."

The Secretary gave formal approval to the contract on February 2, 1945, and authorized its execution. No date was inserted in the contract by the Secretary as its effective date. Wright, on receipt of the contract, dated it February 20, 1945, although he thinks he actually signed it on February 17, 1945. He then transmitted the contract to the defendant for execution, and the defendant executed it without change of date. The testimony of Moses was to the effect that, in signing the contract, he had failed to notice the date and supposed that he was signing a contract which had already been performed.

After the parties on August 23, 1944, had agreed upon the final draft of the proposed contract, and after Wright had forwarded it to the Secretary with the Memorandum asking for its approval and for authority to execute it "as of September 15, 1944," Moses directed T. J. Blewster, the head of the Rate Department of the defendant, to file rate schedules with the Department of Public Utilities which would comply not only with the rate reduction required by the order of the Department of Public Utilities dated June 24, 1944, but also with the $150,000 reduction to governmental customers and the reduction for rural electric cooperatives required by the proposed contract with the Government. Blewster filed with the Department between August 29, 1944, and October 31, 1944, reduced rate schedules, in compliance with his instructions and the directions of the Department. All of the

proposed schedules were gone over by the staff of the Department of Public Utilities, and, after hearings and with some changes, were approved.

The Department of Public Utilities had on October 29, 1944, after a hearing on the rate schedules filed by the defendant which would effect a rate reduction of $1,075,000 annually, required the defendant to file new rate schedules for some governmental customers giving them an additional $58,000 reduction, thus increasing the total rate reduction to $1,133,000 annually.

As already stated, the Department of Public Utilities by its order of June 24, 1944, had ordered a general rate reduction of $975,000 annually. The rate schedules filed by the defendant (with such changes as the Department had ordered), based on consumption for the year ending March 1944, it was estimated would produce a reduction of $158,000 in excess of the $975,000 required by the Department, and would give the preferred governmental customers at least the $150,000 reduction called for in the proposed agreement with the Government.

. In the negotiations culminating in the contract in suit, the parties were dealing with respect to rates in effect in July and August of 1944. This could hardly have been otherwise, because neither party knew what reductions the Arkansas Department of Public Utilities would require or permit. The Memorandum of August 25, 1944, sent by Wright to the Director of the Division of Power of the Department of the Interior specifically refers to the "present average rate to REA consumers" as being 8.4 mills per kilowatt hour.

From the evidence adduced by the defendant, the District Court was, we think, amply justified in concluding that, in anticipation of the execution of the contract by the Government prior to October 31, 1944, when the reduced rate schedules were approved by the Department of Public Utilities, to become effective November 27, 1944, the defend-

ant had, in good faith and in compliance with what it understood to be a firm commitment, reduced its rates to governmental customers and rural electric cooperatives in conformity with the provisions of the proposed contract; that the parties in their negotiations and dealings were concerned only with rates which were in effect prior to October 31, 1944; that the words "present rate of charges," as used in paragraph 28(a) of the contract in suit, referred to such rates and not to rates which became effective thereafter; and that the parties did not contemplate or intend that the defendant should be required to reduce its rates twice to the customers to whom preference was given in the contract.

The evidence is convincing that the Department of Public Utilities of the State of Arkansas had required the defendant to reflect in its reduced rate schedules which were approved on October 31, 1944, the reductions ordered by the Department as well as those provided for governmental customers and rural electric cooperatives in the proposed contract, and did not intend to permit the defendant to give further reductions for the benefit of such customers thereafter.

■ It is, of course, true, as the Government contends, that to justify a court in reforming a contract on the ground of mutual mistake, the evidence that there was a mutual mistake must be clear and convincing. See Weiss v. Turney, 8 Cir., 173 F.2d 617, 619. But we think the judgment in this case does no violence to that rule.

It is doubtful whether, in view of the District Court's finding that the words "present rates" ["present rate of charges"] in paragraph 28 of the contract referred to rates in effect in August 1944, there was any occasion to reform the contract. There is, however, no need to decide the question, since the result is the same in any event.

■ We think the evidence justifies the conclusion that the parties intended to make the contract effective as of Sep-

tember 15, 1944; that the Secretary of the Interior did not, in authorizing the execution of the contract, intend to prescribe a different date; and that the dating of the contract February 20, 1945, was the result of a mutual mistake.

Our conclusion is that the judgment appealed from was correct, except that we think it should have fixed the date of execution of the contract "as of September 15, 1944." As so modified, the judgment appealed from is affirmed.